The first case on our calendar is IBM v. Lima. Councils. Good morning, Your Honor. Good morning. Good morning. We'll hear from appellant. Good morning. You may please the court. Andrew Silverman on behalf of Rodrigo Lima. The district court took the extraordinary step of granting a preliminary injunction that bars Mr. Lima for a year from beginning his new position as corporate vice president of Latin America. The injunction cannot stand if it is premised on three matters. First is that the non-competition provision is overbroad and unenforceable. A non-compete must be no broader than necessary to protect an employer's legitimate business interests. The district court never performed this analysis. If it had, it would have found that the provision was overbroad. Rather than barring former... Overbroad by scope? By duration? By geographical scope? Tell me in what domain it was overbroad. Overbroad in scope, Your Honor. Rather than barring former employees from working in a job that will result in the disclosure or use of IBM information, this non-compete bars them from working in any job for a competitor that, quote, could result in the disclosure or use of IBM information. It's that could result in language that effectively prohibits Mr. Lima from working in the industry because every job in the industry carries with it at least some possible conceivable risk, no matter how infinitesimal, that the information could get disclosed or used. No one disputes that barring employees from an entire industry for a year is unreasonable, especially when the non-compete could have been drafted more narrowly and where Mr. Lima already signed a nondisclosure agreement agreeing to never use or disclose IBM information outside of IBM. Mr. Silverman, can I ask a factual clarification? Yes, Your Honor. Is Mr. Lima on Microsoft's payroll right now? He currently is, Your Honor. He has a position as executive program advisor, which essentially means he is being onboarded in Microsoft until May. It's a position where he's just learning things, but he's not able to speak. He's not communicating. He's just receiving information. So he's not able to actually perform any sort of job in that position.  He is getting paid, Your Honor. So I guess my immediate question is, how do you make an argument that this non-compete is so broad as to prevent Mr. Lima from working if he's got a job? And I don't understand IBM to be contesting or challenging his ability to draw the salary for what he's currently doing from Microsoft. Is your contention that he has a right to work harder to earn the same money he's getting? Does that look like a job like that? He has a job so far as he is being paid, and he is learning about Microsoft, but he's not actually performing any functions. And his salary is at least partially based on his performance. He's not actually performing anything. And so, yes, he's being paid, and he's being paid not an unreasonable sum of money, but he would be paid more money if he was performing his position and actually meeting the benchmarks that they have for him. But I think that that doesn't truly address the question of whether or not the provision is overbroad. Except for a job where he has to sit there and mute, there's no position in the industry that he can possibly perform under this non-compete. And nobody disputes that a non-compete that keeps somebody out of an industry, especially an industry like the tech sector, which is so dynamic, so quickly moving, to keep them out of that industry for a year is unreasonable. It certainly goes far beyond what IBM needs to do in order to protect any legitimate business interest that it has. And that's the key test. And that's what the district court failed to analyze when it looked into the reasonableness of this non-compete. What do you make of the district court's reaction to Microsoft's willingness to build a wall in front of him and wall him off from the 77 clients with whom he has had a lot of experience over the years? I would say that the district court's reaction was bizarre, and I think not within its discretion to act. And that's for two reasons. The first is that courts recognize that when a new employer and employee are willing to take proactive steps to make sure that information is protected, that shows an earnestness, an honestness, an attempt to not disclose information, I think, that should not be overlooked. That's Flatiron Health versus Carson from the Southern District. The second point is that Mr. Lima hadn't started at Microsoft yet, and so he didn't understand the details of exactly how Microsoft would enforce the wall. Would it be a situation where he had to announce in a meeting, this is something I'm not allowed to hear or talk about, and so I'm going to leave the room? Did he just have to push his chair back and not speak? So he didn't know the details of exactly what he needed to be done. But Mr. Lima was more than happy to cure that by offering to the district court that the wall be codified in some way in an order, however the district court wanted it, to make sure that the wall would be enforced, that it would be imposed, and it would exist. Nobody disputes that there is, in fact, a wall. Nobody disputes that it would be enforced. It's really just a question of how it would be done, and that seems simple enough to resolve. I would just add, it seems in the court's dismissal of the wall, there's some, I would say, sort of inherent skepticism in the existence of walls. But again, Flatiron Health in the Southern District says that walls are common. They're not at all inherently suspect, and we see walls all the time. We see them in law firms, and we see them in businesses just as often. So what you have is a situation where Microsoft and Mr. Lima have worked very hard to set up a job where he is doing totally different things than what he was doing at IBM. He will be focused in Latin America, where his last two jobs in IBM were not focused in Latin America. He will be walled off from over 80 companies, only two or three of which he's had any contact with. So I don't think that there is really any risk that he is going to disclose the information that IBM seems to be worried about him disclosing. There's no concern that he's a bad actor, that he's intentionally going to disclose this information. In fact, all of the IBM witnesses who all know Mr. Lima personally testified that he was honest and trustworthy. He understood his disclosure obligations, that he would not deliberately disclose any information. And Microsoft and Mr. Lima have worked very carefully to make sure that his new job is such a job where there's no risk of an inevitable disclosure. There's no so significant overlap in those positions that it would be impossible for him to do that new job without disclosing. Counsel, has the Second Circuit ever applied inevitable disclosure in a non-compete case? It has not, Your Honor, nor has the Court of Appeals of New York. And there's only, I think, one case in the appellate division on inevitable disclosure. And I think that's a really important point. IBM is asking this court to apply and maybe even to expand a doctrine that the New York Court of Appeals has never adopted, never applied, never used. And given that this is a diversity case, given the importance of deferring to state courts as they interpret state law, and the fact that there is no state court precedent at the New York Court of Appeals or at the appellate division. Frankly, I don't know of any case law that supports this unintentional disclosure idea. Can you speak for me? What's the case law support for that? I mean, it's curious to me how someone could unintentionally disclose a trade secret. It's like, oh, it popped into my head. First of all, I think it's dubious whether or not there actually are trade secrets at issue here. The inevitable disclosure doctrine cases generally fall into two categories where they find inevitable disclosure. One is where there's some misconduct or bad act, where there is a deliberate intentional disclosure, where there's likely to be an intentional disclosure that nobody disputes that that is not this case. And then the other is where the employee has some sort of specialized technical knowledge where they're working in one job and they're going to go to another company and do the exact same thing. The IBM versus Papermaster case is a really good example of that. You have IBM's top microprocessor person leaving to go to Apple to work on microprocessors there. And the district court says, it's impossible. What you know about microprocessors, you know from being at IBM. Judge Parker, when he was on the Southern District in the international paper versus Swain, said when you're talking about somebody who is hired because of their managerial experience, their expertise with regard to sales and things like that, those are the cases where inevitable disclosure really doesn't apply. And I think especially given the facts and circumstances of this case. So he did know, your client did know the customers of IBM. And that's the very kind of information that he could bring to a competitor so they could seek to convert those customers to Microsoft. So it is true that he knows of some customers, certainly. But customers themselves are not, you know, the existence of customers. They didn't assert that customer lists were trade secrets, did they? They did not, your honor. And they're not trade secrets. The law is pretty clear on that in New York. And so, yeah, he may know of some customers, but knowing information is not enough for there to be inevitable disclosure. That may show that you have something important, something valuable. I think in the case of customer lists, that's not necessarily true for the reasons Judge Wesley just said. But there has to be that inevitable disclosure component to that. And that comes from either misconduct or from having a job that is so similar to your old job that it is impossible to perform that new job without utilizing the trade secrets of the old job. And that's what the third department said in the Marietta case. Can I ask one question about the trade secrets? The judge in the district court concluded that your client did have access to trade secrets, correct? Yes, your honor. So that predicate finding, in your view, what is our standard of review? So the challenges that we raise that to that issue, your honor, are legal questions. Our argument principally is that the district court did not perform the proper legal analysis to examine whether or not to determine whether or not the information that IBM is talking about is eligible for trade secret protection. That is a purely legal question. This court would review that de novo. Obviously, the overall standard of review for this case, because it's a preliminary injunction, is an abuse of discretion. But a district court abuses their discretion by making a legal error. And that is precisely our argument here. Well, then, if I could just dig one spot deeper, and I'm not going to go on very long, I'm looking at page 16 of the special appendix going into 17. And there's a lengthy paragraph where the district court, well, let's say, makes predicate findings leading to the overall conclusion that there's a trade secret. Do you dispute or do you find clearly erroneous any of the predicate factual findings of the court at the bottom of 16 going into 17, for example, about whether the information is known outside of the business or whether the information at issue is shared only with small groups of IBM's top executives? And I guess my question, it wasn't clear to me from the brief. Do you challenge any of those predicate facts as clearly erroneous? We do not, Your Honor. Our argument is that it may be that this information is kept secret, and that is the analysis that the district court is performing. Very few people, people outside the business do not have it. Very few people in the business have it. Those go to the secrecy of the information, not to whether or not the information is the type of information that can be a trade secret. And things like pricing data and market strategies, strategic plans and communications, business possibilities or goals, plans for expansion or retrenchment, product roadmaps, these are all things that the courts in New York and Southern District have said are not trade secrets. They're not eligible to be trade secrets, regardless of whether or not they're kept secret. They're not trade secrets. And that's really important in this case, because so much of the district court holding depends on there being disclosure or risk to trade secrets. That is the legitimate business interest under the first prong of the reasonableness analysis, under VDO versus Seidman. The inevitable disclosure arises from misappropriation of trade secrets, and there are some cases that say inevitable disclosure is only about trade secrets, and then, of course, this is a preliminary injunction where you have to find irreparable harm. The district court found irreparable harm based on the presumption that the disclosure of trade secrets causes irreparable harm. And without there being trade secrets at issue, that presumption of irreparable harm is gone. Thank you, counsel. You have returned the reserve. Two minutes for rebuttal. We're here from IBM. Thank you. May it please the court, Robert Atkins for IBM. Maybe I'll start where we left off. It's quite clear the judge made very particularized, meticulous findings applying the New York standard for trade secrets and finding that there were trade secrets. He likewise found, and indeed in some cases, Mr. Lima admitted that he has knowledge of those trade secrets that he's bringing with him to Microsoft. And what is really happening here is you have one of IBM's most senior, most highly compensated senior executives operating at the highest levels of the company, going to board meetings, sitting with the chair and CEO and establishing corporate strategy. So he, in effect, is switching sides, switching teams in the middle of the game, in the middle of the competition, crossing the field and bringing with him the playbook, which in large part he wrote and he prepared, including attending meetings within weeks of departing for Microsoft. And yet you don't object to him being paid by Microsoft right now, do you? We don't object to him being paid and we don't object to him taking a position in a non-competitive way, which is what was discussed with the court in which Mr. Silverman described. How is this broad injunction, which precludes him from doing just about anything necessary, why didn't the court look and see how it couldn't be tailored so that he could do some things for Microsoft? You've already conceded that it's simply working for Microsoft doesn't trouble you. He's obviously talking to them. Apparently, he's not spilling all the trade secrets because you haven't asked for additional relief yet, have you? Well, in fact, we are taking expedited discovery by permission of the district court. But to answer your question, the point is that these things under New York law are looked at with some caution and concern. That's what BDO-Sideman is all about. And this, the court didn't do any analysis as to why this broad injunction was necessary. Now, show me where in the court's decision it determined that this was necessary to protect IBM. Well, first of all, the injunction itself is narrowly tailored to the one particular job. He's not prevented from doing anything other than the job in which they sought to have him running Latin America, where he would be developing and implementing global strategies in exactly the same way as he was doing at IBM. But not dealing with any of the clients that he had previously dealt with? The issue in trial was not the client. That's correct. And the issue is not the clients and talking to clients. The issue is developing strategy with the leadership of the corporation and executing that strategy as an executive, not going door to door, but knowing what he knows about IBM. And in particular, at IBM, he authored the document which referred to Microsoft's massive attack, his words, on IBM's client base, including in Latin America. Why not restricting them with regard to the implementation of pricing strategies or other strategies to which he has trade secrets, but allow him to work in the Latin American market otherwise? Because the position he's taking is one in which all the strategies, methodologies, confidential information about pricing, about new products, about the entry date of new products, about the new anchor client, where IBM is going to build a first of its kind cloud computing system for financial services company, which is part of IBM's counterattack to the massive attack that he identified when he worked at IBM. He will be going there with what he knows about IBM's strategies, confidential, and he will now be in a position to defend against and counter that with Microsoft's strategies. Let me ask. Yes, Robert. No, go ahead. Finish. I apologize. No, not at all. I was just going to say, and what's critical here is that he will be operating at the highest echelons of Microsoft. He will be reporting to the person in charge of global strategies. He will be meeting with that team to develop those strategies, knowing exactly what IBM's global strategies are, because he knew about them and participated in the development of them, which is why I say he's switching teams with the playbook. And you say he knows these so well, and part of your position in front of the court was, he knows them so well that he can't separate advising his new employer on how to deal with or counteract IBM's activity in that marketplace, that he inherently is going to disclose or draw upon that information in charting Microsoft's course. Is that it? That's my position. Of course, that was the judge's finding as well. Why is it then he, but what happens on June 1st? He can take the job, right? Yes, he can. And is he enjoined or prohibited from inadvertently drawing upon that information? Not after the expiration of the agreed-upon 12-month period, which is a time period that one hopes was reasonable in duration to ensure that what he left, the information he left with, one hopes is not as valuable as it was. But it's, you know, it is a contract. It is a bargain. How is the district court to know how long the information was valuable? What analysis did the district court do in terms of the length of how long he was enjoined, knowing, correlating the value of that information in its half-life to the length of time that he was precluded from working for Microsoft in that capacity? Based on, first of all, evidence and testimony about what that information was, and finding that that information, specifically finding, and I can get the page reference for you, specifically finding that the strategy information would remain relevant for at least a year, and specifically citing to not only Mr. Lima's involvement in developing and implementing short-term IBM plans, he also authored and discussed long-term strategies, which the judge found would be relevant for the period of the non-compete. Was IBM asked for a longer period? No, not in court and not in the non-compete agreement itself. So is part of your argument basically that the duration of the non-compete is reasonable, and that this was a bargain for a period of time, and that he was actually quite handsomely compensated in part for entering into this non-compete clause? That's correct, Your Honor, and it's reasonable in duration under PDO Seidman because it's at least long enough to cover the trade secrets at issue, their vitality, their significance, their importance, and their value to Microsoft. We could have a hypothetical debate about whether a longer period would have been necessary, but certainly one year is very commonplace, and in this case the judge's findings of fact, none of which are alleged to be clearly erroneous, are more than sufficient to find that the scope in time is reasonable. And presumably IBM would have been less likely to disclose the trade secrets to Mr. Lima if they had not believed that he was subject to a non-compete so that their trade secrets weren't going to be protected at least for that one year period, right? That's correct, and in many ways that undergirds the inevitable disclosure doctrine, which has been around for actually 101 years since Eastman Kodak, which had its 101st birthday last week, and in nearly every case for 100 years… Not the same Eastman Kodak, Mr. Atkins, I'll tell you that. I found the name of the case somewhat amusing, although I didn't know it was 100 years ago, which shows you how young I am. But as the New York state courts have recognized, this doctrine has been around for a long time, and as two of them said, ICON and Spatial Dimensions, it should not be controversial at this point. In fact, I went back and I looked. In virtually every single case of a written non-compete agreement based on trade secrets has been enforced or has been the subject of enforcement using the inevitable disclosure doctrine. By my count, it's 28. Most of them resulted in injunctions, and critically, there is no other test. No court has ever articulated or adopted one. Mr. Lima doesn't propose any alternative test. He just says on the facts it shouldn't apply here. Of course, those facts are not challenged on appeal. And to answer your question, Your Honor, the cases have said without exception that an agreement is enforceable even if the risk is found to be unintentional, inadvertent. That's the very nature of the concept, that if someone is so immersed in such important trade secrets and is doing a job wherein that person will have responsibilities for the same aspects of the business in direct competition, in this case with a fierce competitor, the person is unable, as Judge Halpern found, to divorce himself or herself from that information. I'm sorry. Go ahead and finish, Mr. Rankin. I just wanted to cite the Verizon case. There is a good example where – and this kind of goes to the wall as well. A very senior executive in the Verizon broadband business jumped ship to go to Comcast, which is a fierce competitor in broadband. Comcast created a job for him, specifically for him outside of the broadband division, having nothing to do with broadband. But since he was reporting up to the executive who was responsible for broadband, the court in that case found that it strained credulity to believe that his insights, his knowledge wouldn't come up in discussions with his boss. Here, the risk is 10 or 100 times greater because he is in the same division, selling the same products, going head-to-head just on the other side of the competition. The thing I want to ask you about – I realize you're out of time, and maybe the senator will let you answer, but Special Appendix 2627 is specifically where Mr. Lima raises the fact that he hasn't been general manager in Latin America for three years and that his information is stale. And IBM's response, according to the court, is that his responsibilities were global in nature in the last 12 months and that they included clients in Latin America. Do you think that's sufficient with regard to the fact that because he was in a different job – I mean, the job in which he acquired the trade secrets, he's been out of for three years. But now the current job, even though it's characterized as being an accountant or following or just managing accounts, and he's not participating in developing these strategies. I mean, that's not an answer, is it, to the fact that he's acquiring the same information in that job, is it? But that wasn't our answer, and that wasn't the judge's finding. The judge's finding was that in the last 12 months, because of his global responsibilities, including Latin America, he learned and had responsibility for Latin America. So let me – if I could, I'll read from the – No, I've read it. I had a chance to take a look at it. I wanted to see what your reaction was. Thank you. Thank you, Your Honor. Thank you, all of you, Your Honors. Thank you. Mr. Silverman, you've returned two minutes for rebuttal. Thank you, Your Honor. There's two really important errors of omission, I think, in my friend's presentation that I want to focus on. The first is that his presentation was all about why the IBM information is important. It's valuable. It would be important to IBM. It could be important to Microsoft. But that is only half of the inquiry for inevitable disclosure. You still have to prove that the information would be disclosed. And the reason that that occurs, absent bad faith, is that there's an overlap in the jobs. But what he doesn't do is talk about the overlap in the jobs that would cause that disclosure. Judge Wesley asked about Latin America specifically. Well, Mr. Lima has had only three contacts with Latin American clients since 2017, when he left that general manager position, and all of those were before February 2019. That's at A125 and A126 and A1420 to A1422. Mr. Lima also testified, and it's not been disputed, that he doesn't remember the information. When you look at the information that IBM is focused on, it's one slide from a 71-slide presentation. It's a 20-minute presentation from a two-day meeting. There's just no human way that somebody could remember all of that information. It's conceded that Mr. Lima is credible, he's honest, he's trustworthy, and he testified repeatedly that he does not remember that information. That's at A1361, A1362. Wouldn't that apply to everything, though? I mean, that would sort of undermine every non-compete if the person who's jumping ship just testifies, oh, I forgot all the trade secrets. I mean, I think you hardly expect the other side to say, well, yeah, I bet you don't remember anything from when you worked at our job, and we'll just take your word for it. I mean, don't they have a right? Didn't they bargain for a one-year, whatever you want to call it, cooling-off period to ensure that memories fade or to ensure that if remembered, those trade secrets become less critical to the management of the business? But didn't they basically bargain for the one year to let the memories fade?  The first is that there's no bargaining here. IBM gives Mr. Lima a take-it-or-leave-it, you-will-lose-your-job-if-you-don't-sign-this non-compete as we've drafted it. You didn't have to work there, right? He could have jumped ship. He got a lot of money, right? Like millions of dollars, wasn't it? He was highly paid, but he was highly paid before he signed that non-compete. The salary wasn't about the non-compete. To me, IBM would assume they would not say, well, we compensated you for part of this, but no, not for the non-compete. Presumably, they view it as part of a package, right? Yeah, that's true, Your Honor. But he was being paid that same amount of money before he signed this non-compete. That's the only point I'm making. But I think more fundamentally, the problem with IBM's argument, the reason why in this case it is totally believable that Mr. Lima doesn't remember this information, is that it goes to the weakness of IBM's case. They're talking about a single slide in a 71-slide presentation, a 20-minute presentation in a two-day meeting. If they had better evidence, if they had evidence not – you know, they talk in their brief, he was privy to this information, he had access to this information, he used this information. If they had better evidence that actually connected the information to Mr. Lima, then I think it would be much more believable to say it seems he would remember this. But that's the purpose of cross-examination. There was a three-day hearing, and nowhere during that three-day hearing were they able to elicit any evidence that Mr. Lima actually remembered these things, and it was conceded by the IBM witnesses that know him best, that he's credible, that he's honest, that he's trustworthy, that he would protect that information. The second key omission is that there was a lot of talk during my friend's presentation about trade secrets, but never once an explanation about how any of the information that we're talking about are trade secrets. He said things like strategy, marketing, anchor client. Those are not trade secrets. It's important business information to be sure, information that IBM would want to keep confidential, but that doesn't make it a trade secret, and it is really important in this case, given the district court's opinion, that it be a trade secret. That's what the district court's opinion hinges on, and if I could just conclude with this. Why isn't the global strategy a trade secret? Business strategy, Your Honor, isn't a trade secret. It's confidential information, but in DS Parent, Inc. v. Type from the Northern District of New York, strategic plans and communications are not trade secrets. Business possibilities are goals. Linko v. Fujitsu from the Southern District of New York. Plans for expansion or retrenchment, the restatement, which the New York law is based on, as well as Earth Web v. Schlack from the Southern District of New York. Price data and market strategies, Marietta Corp. This is the third department case. Counsel, tell me what you think are trade secrets. Describe them in the context of this case. So trade secrets, I think, oftentimes are technical information. They don't have to be, but the Verizon case that my friend was talking about, those are things like formulas, patterns, devices, or compilations of information to be used in one's business. Think about the paper master case there. He's the head of IBM's microprocessor unit. He's building microprocessors. There are trade secrets in there. But here you're talking about a sales executive who was hired by Microsoft because he's a good sales executive. He exceeds his requirements. He's a good manager. Those are the things that Judge Parker said in an international paper versus Swinner. Those are not trade secrets, and those are not the sorts of things that you worry are inevitably going to be disclosed. There's no information that's IBM information that you're worried about there. I mean, remember, the purpose of non-competes under New York law, the reason why they are allowed, even though they're disfavored, is in order to protect that really sensitive, important trade secret information, confidential customer list, and that's just not what we have in this case. And it's just so critical to the district court's opinion that every step of the analysis, the district court is assuming that there is a trade secret, but there isn't, and that means there's no irreparable harm. It means there's no legitimate business interest. It means the inevitable disclosure doctrine doesn't apply, and I'll just end with this. I began by talking about overbreath and how broad that could result in languages. Through their briefing and now through argument, IBM has never disputed, and in fact they've conceded that that could result in languages overbroad. What they are concerned about is a job where Mr. Lima will disclose information. They're not harmed by a job where he could but doesn't actually disclose information. They could have drafted this non-compete in a way that was much narrower, particularly given the circumstances of this case, the existence of a non-disclosure agreement, and they didn't do that. And under a BDO versus Seidman, it is unenforceable for that reason. Thank you. Thank you both. Before you leave, I want to tell you how good I found the brief. Very, very helpful. Thank you very much. Thank you, Your Honor. A well-reserved decision. We will turn to the next case on our calendar. Thank you, Your Honor. Thank you both.